STATE of Missouri, ex rel., PUBLIC COUNSEL, Appellant,

State of Missouri, ex rel., Ameren Missouri, Appellant,

State of Missouri, ex rel., Kansas City Power & Light Company and KCP & L Greater Missouri Operations Company, Appellant,

v.

PUBLIC SERVICE COMMISSION OF the STATE of Missouri, Respondent.

Earth Island Institute, Respondent.

Nos. WD 74676, WD 74678, WD 74848, WD 74849, WD 74850.

Missouri Court of Appeals, Western District.

Jan. 15, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 5, 2013.

Application for Transfer Denied May 28, 2013.

**444**

Paul A. Boudreau, Jefferson City, for Appellant Ameren Missouri.

Lewis R. Mills, Jr., St. Louis, for Appellant Office of Public Counsel.

Larry W. Dority, Jefferson City, for Appellant Kansas City Power & Light Company & KCP & L Greater Missouri Operations Company.

Henry B. Robertson, for Respondent Earth Island Institute.

Jennifer L. Heintz, for Respondent Public Service Commission.

Before Division Two: JOSEPH M. ELLIS, Presiding Judge, ALOK AHUJA, Judge and MARK D. PFEIFFER, Judge.

JOSEPH M. ELLIS, Judge.

Appellants Union Electric Company d/b/a Ameren Missouri ("Ameren"), Kansas City Power & Light Company and KCP & L Greater Missouri Operations Company (collectively "KCP & L"), and the Office of Public Counsel ("the OPC") appeal from four final orders of rulemaking entered by the Public Service Commission ("the Commission") adopting rules to implement the Missouri Energy Efficiency Investment Act, § 393.1075. For the fol-

lowing reasons, the four orders of rulemaking are affirmed.

In 2009, the Missouri legislature enacted the Missouri Energy Efficiency Investment Act ("the MEEIA"). The MEEIA establishes that it is Missouri's policy "to value demand-side investments equal to traditional investment in supply and delivery infrastructure and allow recovery of all reasonable and prudent costs of delivering cost-effective demand-side programs." § 393.1075.3 RSMo Cum.Supp.2009. The MEEIA further provides that the Commission, in support of the State's demand-side investment policy, shall:

(1) [p]rovide timely cost recovery for utilities; (2) [e]nsure that utility financial incentives are aligned with helping customers use energy more efficiently and in a manner that sustains or enhances utility customers' incentives to use energy more efficiently; and (3) [p]rovide timely earnings opportunities associated with cost-effective measurable and verifiable efficiency savings.

§ 393.1075.3(1)–(3). The MEEIA also instructs the Commission that it "may develop cost recovery mechanisms to further encourage investments in demand-side programs" and that, when setting rates, the Commission must "fairly apportion the costs and benefits of demand-side programs to each customer class." § 393.1075.5.

Following the MEEIA's enactment, the Commission opened a workshop docket and ordered its staff to file a draft rule regarding implementation of the MEEIA no later than June 30, 2010. On June 17, 2010, the Commission issued its Notice Finding Necessity for Rulemaking, which opened a formal rulemaking docket. On June 30, 2010, the Staff of the Commission provided its Proposed Rules, which set forth four rules: 4 C.S.R. § 240–3.163, 4

C.S.R. § 240–3.164, 4 C.S.R. § 240–20.093, and 4 C.S.R. § 240–20.094.

On November 15, 2010, notice of the proposed rules, along with the proposed rules themselves, were published in the *Missouri Register*.[1] The period for public comment on the proposed rules concluded on December 15, 2010, and, on December 20, 2010, a hearing was held before the Commission regarding the Proposed Rules. Seventeen entities participated in the hearing, including Appellants Ameren, KCP & L, and the OPC. Respondent Earth Island Institute d/b/a Renew Missouri ("Renew Missouri") also participated in the public hearing.[2] Amici Curiae AARP, the Consumers Council of Missouri, and Missouri Industrial Energy Consumers (collectively "Amici Curiae") all submitted comments to the Commission concerning the proposed rules.

On February 9, 2011, the Commission issued its final Orders of Rulemaking with respect to each of the four rules. Appellants Ameren, KCP & L, and the OPC all filed motions for rehearing with the Commission. On March 14, 2011, the Commission denied their motions for rehearing. Ameren, KCP & L, and the OPC each filed a petition for writ of review by the Circuit Court of Cole County challenging the lawfulness and reasonableness of the Commission's four final orders of rulemaking. On December 27, 2011, the circuit court issued its Amended Findings of Fact, Conclusions of Law and Judgment[3] in which it affirmed the Commission's orders of rulemaking as lawful and reasonable. Each Appellant appeals from the circuit court's judgment affirming the Commission's orders of rulemaking. We have consolidated their appeals for purposes of this opinion.

The rules, as adopted in the final rulemaking orders, set forth the requirements and procedures by which electric utilities are to file for approval, modification, or discontinuation of demand-side programs with the Commission. Demand-side programs are "program[s] conducted by [a] utility to modify the net consumption of electricity on the retail customer's side of the meter including, but not limited to, energy efficiency measures, load management, demand response, and interruptible or curtailable load." 4 C.S.R. § 240–20.094(1)(I). Stated another way, demand-side programs are programs instituted by a utility in an effort to increase energy efficiency by reducing its customers' use of and demand for electricity.

Because any reduction in consumer use of electricity ultimately affects a utility's revenue, utilities have traditionally been reluctant to implement demand-side programs. Thus, the rules also permit utilities to apply for a demand-side program investment mechanism ("DSIM") when they apply to the Commission for approval of their demand-side programs. 4 C.S.R. § 240–20.093(1)(M). DSIMs are mechanisms approved by the Commission that encourage investments in demand-side programs. 4 C.S.R. § 240–20.093(1)(M). Under the rules, a utility's DSIM can include any or a combination of the following: (1) "[c]ost recovery of demand-side program costs through capitalization of investments in demand-side programs," (2)

---

1. The proposed rules appear at 35 Mo. Reg. 1610–85 (Nov. 15, 2010).

2. Respondent Renew Missouri motioned this court to intervene on behalf of the Commission on appeal. We sustained that motion.

3. The trial court issued its original Findings of Fact, Conclusions of Law and Judgment with respect to Appellants' writs for review on November 4, 2011. However, the November 4, 2011 judgment included incorrect case number references. Those references were corrected by the trial court's amended judgment.

"[c]ost recovery of demand-side program costs through a demand-side program cost tracker," (3) "[a]ccelerated depreciation on demand-side investments," (4) "[r]ecovery of lost revenues," and (5) "[u]tility incentives based on the achieved performance level of approved demand-side programs." 4 C.S.R. § 240–20.093(1)(M).

In approving a utility's DSIM, the Commission also approves a DSIM rate. The DSIM rate is a charge attributable to a utility's DSIM that appears on customers' bills. 4 C.S.R. § 240–20.093(1)(O). Pursuant to the rules, the Commission can approve a DSIM that would permit the DSIM rate to be adjusted outside of a general rate case proceeding. 4 C.S.R. § 240–20.093(4); 4 C.S.R. § 240–20.093(1)(N).

Appellants raise the following points of error regarding the Commission's orders of rulemaking adopting rules 4 C.S.R. § 240–3.163, 4 C.S.R. § 240–3.164, 4 C.S.R. § 240–20.093, and 4 C.S.R. § 240–20.094. Ameren asserts that the Commission's orders of rulemaking are unlawful and unreasonable because (1) the Commission's definition of "lost revenues" contravenes the MEEIA in that it permits utilities to recover lost revenue only when their net system retail KWh sales drop below the level used to set rates and (2) the recovery of energy efficiency program costs occurs only on a retrospective basis thereby contravening the expressed policy objectives of the MEEIA. KCP & L contends that the Commission's orders of rulemaking are erroneous because (1) the Commission's definition of lost revenues unlawfully and unreasonably creates disincentives to investments in demand-side programs in contravention of the goals and objectives of the MEEIA; (2) the lost revenue adjustment mechanism unlawfully and unreasonably allows only for retrospective application of the lost revenue

component in contravention of the goals and objectives of the MEEIA; (3) the Commission's requirements for semi-annual adjustments of DSIM rates are unlawful and unreasonable because they do not permit adjustments to lost revenue components or incentives in contravention of the goals and objectives of the MEEIA; and (4) the rules violate § 536.014. The OPC avers that the Commission's orders of rulemaking are erroneous in that (1) the rules unlawfully permit rate adjustment outside of general rate cases without having the statutory authority to do so; (2) the rules exceed the statutory authority granted to the Commission by the legislature in the MEEIA by permitting the recovery of lost revenue, (3) the Commission concluded it lacked the statutory authority to create rules, the violation of which could lead to the imposition of penalties, when it has the broad regulatory authority to impose such penalties; and (4) the Commission failed to comply with § 536.021.6(4) in the order of rulemaking pertaining to 4 C.S.R. 240–20.094 thereby making the rule unenforceable.

 We begin by addressing the OPC's points of error. In its first point, the OPC asserts that the Commission erred in promulgating rules that permit DSIM rates to be adjusted outside of general rate cases because such rules are unlawful in that such adjustment mechanisms exceed the statutory authority granted to the Commission under the MEEIA. Judicial review of the Commission's order is two-fold. *State ex rel. Office of Pub. Counsel v. Mo. Pub. Serv. Comm'n*, 331 S.W.3d 677, 682 (Mo.App. W.D.2011). "First we must determine whether the [Commission's] order was lawful." *State ex rel. Midwest Gas Users' Ass'n v. Pub. Serv. Comm'n*, 976 S.W.2d 470, 476 (Mo. App. W.D.1998). "An order's lawfulness depends on whether the [Commission's]

order and decision was statutorily authorized." *Id.* "When determining whether the order is lawful, we exercise independent judgment and must correct erroneous interpretations of the law." *Office of Pub. Counsel,* 331 S.W.3d at 682. "Because the [Commission] is purely a creature of statute, its powers are limited to those conferred by statute either expressly, or by clear implication as necessary to carry out the powers specifically granted." *Id.* (internal quotation omitted).

■ "Second, we must determine whether the [Commission's] order was reasonable." *Midwest Gas Users',* 976 S.W.2d at 476. In determining whether the Commission's order is reasonable, we consider (1) "whether it was support by substantial and competent evidence[4] on the whole record," (2) "whether the decision was arbitrary, capricious, or unreasonable," and (3) "whether the [Commission] abused its discretion." *Id.*

■ Additionally, our review of the Commission's order is limited to the Commission's findings and conclusions, not the judgment of the circuit court. *Office of Pub. Counsel,* 331 S.W.3d at 682. "[T]he party seeking to set aside the [Commission's] order has the burden to prove by clear and satisfactory evidence that the order was unlawful or unreasonable." *Id.* We will not substitute our judgment for that of the Commission when its decision is based purely on factual issues. *Id.* at 683.

Because the OPC challenges the Commission's statutory authority to promulgate rules that permit utilities to adjust their DSIM rates outside of general rate case proceedings, "it is helpful to first examine the parameters of the regulatory power granted to the [Commission] by the legislature." *Midwest Gas Users',* 976 S.W.2d at 477. "The basic powers and duties of the [Commission] are set forth in Chapter 393 of the Missouri statutes." *Id.*

Section 393.140(11) gives the Commission the power to require electric corporations to file and keep open for public inspection "schedules showing all rates and charges made, established or enforced or to be charged and enforced, all forms of contract or agreement and all rules and regulations relating to rates, charges or service used or to be used, and all general privileges and facilities granted or allowed by such ... electrical corporation." *See also State ex rel. Utility Consumers' Council of Mo. v. Pub. Serv. Comm'n,* 585 S.W.2d 41, 48 (Mo. banc 1979). When an electrical corporation files a schedule with the Commission stating a new rate or charge, the Commission has the authority, "either upon complaint or upon its own initiative without complaint" to conduct a hearing concerning the propriety of such rate. § 393.150.1; *Midwest Gas Users',* 976 S.W.2d at 477; *Utility Consumers' Council,* 585 S.W.2d at 48. After complying with the requisite notice, investigation, and hearing procedures involved with the filing of a new rate, the Commission may fix the maximum price of electricity for an electric corporation for a fixed period of time. § 393.270.2; § 393.270.3; *see also Midwest Gas Users',* 976 S.W.2d at 477. In determining the appropriate fixed electricity rate,

> the commission may consider all facts which in its judgment have any bearing upon a proper determination of the question although not set forth in the complaint and not within the allegations contained therein, with due regard, among other things, to a reasonable av-

---

**4.** "Substantial evidence is competent evidence which, if true, has a probative force on the issues." *Office of Pub. Counsel,* 331

S.W.3d at 683 n. 7 (internal quotation omitted).

erage return upon capital actually expended and to the necessity of making reservations out of income for surplus and contingencies.

§ 393.270.4.

In reliance upon § 393.270.4, Missouri courts have traditionally held that the Commission's "determination of the proper rate for [utilities] is to be based on all relevant factors rather than on consideration of just a single factor." *Midwest Gas Users'*, 976 S.W.2d at 479. Thus, when a utility's rate is adjusted on the basis of a single factor, without consideration of all relevant factors, it is known as single-issue ratemaking. *See id.* Single-issue ratemaking is generally prohibited in Missouri "because it might cause the [Commission] to allow [a] company to raise rates to cover increased costs in one area without realizing that there were counterbalancing savings in another area." *Id.* at 480.

Nonetheless, Missouri courts have recognized that "the [C]ommission has the power to treat one item of operating expense differently than another, and, further, that it can determine which items should be included in operating expenses and which items should not be included." *Utility Consumers' Council*, 585 S.W.2d at 51. The Commission, therefore, "can comply with the requirements of Section 393.270.4 without holding a general rate hearing every time there is a change in the amount of the charge to be adjusted." *Midwest Gas Users'*, 976 S.W.2d at 479.

As promulgated, provisions in rules 4 C.S.R. § 240–3.163, 4 C.S.R. § 240–3.164, 4 C.S.R. § 240–20.093, and 4 C.S.R. § 240–20.094 permit electric utilities to adjust their rates outside of general rate case proceedings solely on the basis of costs attributable to their investments in demand-side programs. Thus, the rules permit single-issue ratemaking. The Commission and Respondent Renew Missouri do not contest that the rules permit single-issue ratemaking. Instead, they aver that the MEEIA provides the Commission with the statutory authority to permit such rate adjustments outside a general rate case proceeding.

As previously explained, the Commission's "powers are limited to those conferred by statute either expressly, or by clear implication as necessary to carry out the powers specifically granted." *Office of Pub. Counsel*, 331 S.W.3d at 682 (internal quotation omitted). The Commission and Respondent Renew Missouri concede that the MEEIA does not provide an explicit grant of authority for the Commission to engage in single-issue ratemaking with respect to developing cost-recovery mechanisms that encourage investment in demand-side programs. Rather, they assert the Commission has the implied authority under the MEEIA to promulgate a rule that allows for a semiannual adjustment of DSIM rates outside of a general rate case proceeding.

In support of its contention that the Commission does have such statutory authority under the MEEIA, Renew Missouri points to the following language:

It shall be the policy of the state to value demand-side investments equal to traditional investments in supply and delivery infrastructure and allow recovery of all reasonable and prudent costs of delivering cost-effective demand-side programs. In support of this policy, the commission shall:

(1) Provide *timely* cost recovery for utilities;

(2) Ensure that utility financial incentives are aligned with helping customers use energy more efficiently and in a manner that sustains or enhances utility customers' incen-

tives to use energy more efficiently; and

(1) Provide *timely* earnings opportunities associated with cost-effective measurable and verifiable efficiency savings.

§ 393.1075.3 (emphasis added). Renew Missouri relies upon the legislature's use of the word "timely" to justify the Commission's adjustment of rates outside of general rate case proceedings. It contends that the legislature's use of the word "timely" clearly indicates that the legislature believed that "the interval between rate cases may not be timely enough," otherwise, timely would not need to be expressly stated in the statute.

The OPC counters Renew Missouri's argument by relying heavily on the fact that the MEEIA, as introduced in SB 376, included language that expressly permitted the Commission to develop "a cost adjustment clause for collection of costs associated with energy efficiency programs." The OPC avers that the inclusion of such language in SB 376 demonstrates that the legislature knows how to create a single-issue ratemaking exception and that we cannot interpret the legislature's inclusion of the word "timely" as an adequate substitute for such explicit language. We disagree.

First, it is important to note that the MEEIA, as enacted, differs significantly in structure, language, and substance from the bill as it was originally introduced in SB 376. In fact as introduced in SB 376, the MEEIA did not include the word "timely." Therefore, although SB 376 is relevant to the discussion of the Commission's authority under the MEEIA, it is not controlling.

Furthermore, as the OPC conceded at oral argument, its interpretation of the MEEIA would result in the word "timely" amounting to superfluous language. "The

primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning." *State ex rel. Unnerstall v. Berkemeyer,* 298 S.W.3d 513, 519 (Mo. banc 2009). "We presume that the legislature intended that each word, clause, sentence, and provision of a statute have effect and should be given meaning" and "that the legislature did not insert idle verbiage or superfluous language in a statute." *Office of Pub. Counsel,* 331 S.W.3d at 684.

In its briefing, the OPC suggests that "timely" means "done or occurring at a suitable time" or "falling within the time prescribed by law." But by its own admission, such an interpretation of the word "timely" gives no additional meaning to the MEEIA. As previously explained, Missouri generally prohibits changing of rates outside of a general rate case. Therefore, by default, any cost recovery would generally occur during a general rate case proceeding. Thus, there would be no need for the legislature to include the word "timely" in the MEEIA if the legislature had intended for utilities to recover their costs associated with demand-side programs during general rate case proceedings only.

Moreover, in discerning the legislature's intent, we "may review the earlier versions of the law, or examine the whole act to discern its evident purpose, or consider the problem that the statute was enacted to remedy." *Unnerstall,* 298 S.W.3d at 519. There is no dispute that the MEEIA was enacted to ensure that demand-side investments were valued equally with traditional supply-side investments. To this end, the MEEIA expressly provides that "the [C]ommission may develop cost recovery mechanisms to further encourage investments in demand-side programs *including, in combination*

*and without limitation*" before listing several cost recovery mechanisms. *See* § 393.1075.5 (emphasis added). In § 393.1075.11, the General Assembly also specified that "[t]he commission shall provide oversight and may adopt rules and procedures and approve corporation specific settlements and tariff provisions, ... as necessary, to ensure that electric corporations can achieve the goals of this section." Thus, the MEEIA gives the Commission discretion in developing cost recovery mechanisms in its efforts to encourage investment in demand-side programs. As is evident from the record, a major concern for utilities in investing in demand-side energy efficiency programs is the financial risk that occurs the longer the time between an expenditure and its recovery. Therefore, it follows that in permitting the utilities to adjust their DSIM rates outside of general rate case proceedings, the Commission was exercising its discretion to develop a cost-recovery mechanism that would encourage utilities to invest in demand-side programs despite the financial risk.

In light of the legislature's use of the word "timely" in combination with the broad grant of authority given to the Commission to develop cost-recovery mechanisms that encourage demand-side investments, we cannot say that the Commission lacked the statutory authority to promulgate rules that allow for DSIM rates to be adjusted semiannually. Accordingly, despite the OPC contention that a more explicit grant of authority is necessary to confer authority for single-issue ratemaking, there are implications in the MEEIA that suggest the legislature intended the Commission to have the discretion to promulgate rules that permitted rate adjust-

ments outside of general rate case proceedings. Point denied.

 In relation to the Commission's statutory authority to permit rate adjustments outside a general ratemaking case proceeding, KCP & L asserts, in its third point, that the Commission's requirements for semi-annual adjustments of DSIM rates are unlawful and unreasonable because they do not permit adjustments to lost revenue components or incentives.[5] KCP & L suggests that limiting the semi-annual adjustments to the cost recovery component contravenes the goals and objectives of the MEEIA, which provides that the Commission shall "ensure financial incentives" and "timely cost recovery."

 Although KCP & L couches its argument in terms of lawfulness, its argument actually goes to the reasonableness of the requirements. In reviewing rules promulgated by the Commission, we are mindful that "administrative rules and regulations issued under the authority of a statute should not be judicially invalidated except for weighty reasons and are to be sustained unless unreasonable and plainly inconsistent with the act." *Purler–Cannon–Schulte, Inc. v. City of St. Charles*, 146 S.W.3d 31, 47 (Mo.App. E.D.2004) (internal quotation omitted). Thus, we will not deem a rule "unreasonable merely because of a subjective feeling that it is arbitrary." *Id.* (internal quotation omitted). After reviewing KCP & L's argument with respect to the three cost-recovery opportunities set forth in 4 C.S.R § 240–20.093, it is apparent the KCP & L is merely arguing that the semi-annual adjustment provision is unreasonable because it believes utilities should be permit-

---

**5.** Rule 4 C.S.R. § 240–20.093(4) provides that "[s]emiannual adjustments to DSIM rates between general rate proceedings shall only include adjustments to the DSIM cost recovery revenue requirement and shall not include any adjustments to the DSIM utility lost revenue requirement or the DSIM utility incentive revenue requirement."

ted to recover the lost revenues and incentives components on the same semi-annual basis that the rules permit the cost recovery component to be recovered. Such an argument is subjective and certainly does not constitute a sufficiently weighty reason for invalidating 4 C.S.R § 240–20.093. Thus, KCP & L's third point is denied.

 We now address OPC's second point on appeal. The OPC asserts that the Commission erred in promulgating rules that permit the recovery of lost revenues because the Commission lacked the statutory authority to do so under the MEEIA. The OPC and the Amici Curiae assert that nothing in the MEEIA's language, either expressly or impliedly, gives the Commission the authority to permit utilities to recover lost revenues as a cost-recovery mechanism.

The MEEIA made it Missouri's policy "to value demand-side investments equal to traditional investments in supply and delivery infrastructure and allow recovery of all reasonable and prudent costs of delivering cost-effective demand-side programs." § 393.1075.3. In support of this policy, the legislature instructs the Commission to:

(1) Provide timely cost recovery for utilities;

(2) Ensure that utility financial incentives are aligned with helping customers use energy more efficiently and in a manner that sustains or enhances utility customers' incentives to use energy more efficiently; and

(3) Provide timely earnings opportunities associated with cost-effective measurable and verifiable efficiency savings.

§ 393.1075.3(1)-(3). The MEEIA further provides that, "[t]o comply with this section, the [C]omission may develop cost recovery mechanisms to further encourage

investments in demand-side programs." § 393.1075.5.

In its orders of rulemaking, the Commission justifies its inclusion of lost revenues as follows:

Section 393.1075.3 requires the [C]ommission to "allow recovery of *all* reasonable and prudent costs of delivering cost-effective demand-side programs." Additionally Section 393.1075.3(2) requires the [C]ommission to ensure that "utility financial incentives are aligned with helping customers use energy more efficiently and in a manner that sustains or enhances utility customers' incentives to use energy more efficiently." Section 393.1075.5 states the [C]ommission "may develop cost recovery mechanisms to further encourage investment in demand-side programs … [.]" Lost revenue is a cost of delivering cost-effective demand-side programs, and the proposed rule[s] … require evaluation, measurement and verification (EM & V). Any request of lost revenue will have to be verified and approved by the [C]ommission prior to recovery.

Thus, the Commission permitted recovery of lost revenues on the basis that lost revenue is a reasonable and prudent cost of delivering cost-effective demand-side programs and that recovery of lost revenue is necessary to ensure utility financial incentives align with helping customers to use energy more efficiently.

The OPC contends that lost revenues cannot be considered a cost for purposes of the MEEIA. However, section 393.1075.3, which states "[i]t shall be the policy of the state to … allow recovery of all reasonable and prudent costs of delivering cost-effective demand-side programs," does not define the term "cost." "[A]bsent a statutory definition, the 'primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain

language of the statute.'" *Office of Pub. Counsel,* 331 S.W.3d at 688 (quoting *State ex rel. White Family P'ship v. Roldan,* 271 S.W.3d 569, 572 (Mo. banc 2008)). We derive a word's plain and ordinary meaning from the dictionary. *Id.*

The dictionary defines the term "cost" as "the amount or equivalent paid or given or charged or engaged to be paid or given for anything bought or taken in barter of for services rendered" or "whatever must be given, sacrificed, suffered or forgone to secure a benefit or accomplish a result."[6] Under the MEEIA's plain language, therefore, the phrase "recovery of all reasonable and prudent costs of delivering cost-effective demand-side programs" refers to all amounts charged or paid in delivering cost-effective demand-side programs as well as whatever a utility sacrifices or forgoes in delivering cost-effective demand-side programs.

Although lost revenue is not an amount paid by or charged to the utility in delivering demand-side programs, none of the parties contest that utilities will forgo or sacrifice revenue as a result of delivering cost-effective demand-side programs. Accordingly, lost revenues can be construed as a cost of delivering demand-side programs in the context of the MEEIA.

The Commission also cites to § 393.1075.3(2) as support for its inclusion of recovery of lost revenues as a cost-recovery mechanism under the rules. Section 393.1075.3(2) provides that the Commission shall "[e]nsure that utility financial incentives are aligned with helping customers use energy more efficiently and in a manner that sustains or enhances utility customers' incentives to use energy more efficiently." As the parties articulate throughout their briefs, one of the major drawbacks for utilities in implementing en-

ergy efficiency programs is the potential financial impact such programs can have on utilities. The goal of energy efficiency programs is to decrease customer use of and demand for electricity. Consequently, energy efficiency programs decrease the demand for electric utilities' product, which, in turn, decreases a utility's revenue. Therefore, because of the negative financial impact energy efficiency programs have on utilities, it follows that allowing recovery of lost revenue attributable to energy efficiency programs would act as an effective mechanism to ensure utility financial incentives are aligned with helping customers to use energy more efficiently.

The OPC and the Amici Curiae further challenge the Commission's authority to permit recovery of lost revenues pursuant to the MEEIA on the basis that the MEEIA, as introduced in SB 376, included language that expressly permitted the recovery of lost revenue. They assert that the absence of such language in the MEEIA, as enacted, evidences the legislature's intent not to permit recovery of lost revenues under the statute. However, the absence of such language from the MEEIA as enacted is not dispositive of the legislature's intent. As previously discussed, substantial differences exist between the earlier proposed legislation and the MEEIA, as enacted. Thus, we do not find it dispositive that the final legislation omits SB 376's explicit references to recovery of "lost sales" or "lost margins."

Furthermore, SB 376 suggests that the legislature views lost revenues as a cost of providing energy efficiency programs. The MEEIA, as introduced in SB 376, stated that the Commission "shall develop cost recovery mechanisms that value energy efficiency investments equal to or bet-

**6.** *Webster's Third New International Dictio-* *nary Unabridged* 515 (1961).

ter than traditional supply side investments. Such mechanisms shall include the capitalization of investments in and expenditures for energy efficiency programs and a *recovery of lost sales attributable to approved energy efficiency programs.*" SB 376 further provided that the Commission "may also develop cost recovery mechanisms to further encourage investments in energy efficiency including ... allowing the utility a fixed investment recovery mechanism to *recover lost margins.*" (Emphasis added). Thus, the language of SB 376 infers that the legislature viewed recovery of lost revenues as a cost-recovery mechanism in the context of energy efficiency programs.

Therefore, in liberally construing § 393.1075, as we are required to do in effectuating its purpose, *see Office of Pub. Counsel,* 331 S.W.3d at 682, recovery of lost revenue is impliedly authorized under the MEEIA. The Commission's orders of rulemaking are, thereby, not unlawful in that they permit the recovery of lost revenues. Point denied.

 Because recovery of lost revenues is authorized under the MEEIA, we turn to Ameren's and KCP & L's points of error regarding whether the Commission's definition of lost revenues contravenes the goals and objectives of the MEEIA. Both Ameren and KCP & L assert that the lost revenues definition fails to encourage investment in demand side programs and is, therefore, inconsistent with the purpose of the statute.

As promulgated, the rules define "lost revenue" as

the net reduction in utility retail revenue, taking into account all changes in costs and all changes in any revenues relevant to the Missouri jurisdictional revenue requirement, that occurs when utility demand-side programs approved by the commission in accordance with 4

CSR 240–20.094 cause a drop in net system retail kWh delivered to jurisdictional customers below the level used to set the electricity rates. Lost revenues are only those net revenues lost due to energy and demand savings from utility demand-side programs approved by the commission in accordance with 4 CSR 240–20.094 Demand–Side Programs and measured and verified through EM & V.

4 C.S.R. § 240–3.163(1)(Q). Thus, the Commission narrowly tailored the term "lost revenues" to mean the net reduction in a utility's retail revenue that occurs when a utility's demand-side program causes the net retail kilowatt hours to fall below the level that was used to set rates in the utility's last rate case. Ameren and KCP & L assert that by allowing recovery of lost revenue in such a limited fashion, the Commission's definition of lost revenues is inconsistent with the goals and objectives of the MEEIA. They further contend that the definition overlooks other costs and expenditures associated with the implementation of energy efficiency programs and advocate that the lost revenues definition should be modified to conform to the definition of lost revenues included in the Commission's Chapter 22 rules, which address integrated resource planning.

However, the fact that Ameren and KCP & L believe a more consistent or advantageous definition of lost revenues exists does not mean the Commission's definition of lost revenues is wholly inconsistent with the purpose of the MEEIA. "[A]dministrative rules and regulations issued under the authority of a statute should not be judicially invalidated except for weighty reasons." *Purler–Cannon–Schulte, Inc.,* 146 S.W.3d at 47 (internal quotation omitted). Thus, we will sustain a rule unless it is "unreasonable and plainly inconsistent with the act." *Id.* (internal quotation omitted).

The Commission's definition of lost revenues limits the recovery of lost revenues to revenue lost because of a utility's demand-side programs. Thus, the Commission's definition assures that any lost revenues recovered by a utility would be revenue the utility sacrifices or forgoes as a result of delivering cost-effective demand-side programs. Accordingly, the Commission's definition of lost revenues is consistent with the directive of the MEEIA that utilities be allowed to recover costs attributable to delivering demand-side programs.

Additionally, § 393.1075.4 provides that the Commission cannot permit recovery unless the programs "result in energy or demand savings and are beneficial to all customers." As reflected in comments submitted to the Commission, some participants expressed concern that permitting recovery of lost revenues would permit "double dipping" by utilities claiming lost revenue but continuing to build load. The Commission narrowly tailored its definition of lost revenues to ensure that utilities recover lost revenues only when a utility's demand-side programs verifiably result in a reduction of customer demand and usage. Thus, the Commission's definition follows the MEEIA's directive that recovery be permitted only where energy and demand savings occur.

Furthermore, to the extent that Ameren and KCP & L aver the Commission's definition must be modified to conform to the definition of lost revenues in Chapter 22, they have cited no legal authority for such proposition. Moreover, testimony at the hearing and comments submitted by participants indicates that the Commission could have reasonably concluded that the definition of lost revenue used in Chapter 22 to address integrated resource planning

is not consistent with the purposes of the MEEIA.[7] The testimony and commentary by the participants established that the rules regarding integrated resource planning and the MEEIA are meant to accomplish different purposes. As explained by the Commission in its orders of rulemaking, "the Chapter 22 definition [of lost revenue] is used exclusively to exclude lost revenues from the definitions of annualized costs for end-use measures, from the definition of costs for the utility cost test, and from the definition of costs for the total resource cost test." Thus, the Chapter 22 definition of lost revenues was not drafted in the context of permitting cost recovery for investments in demand-side programs. Testimony at the hearing also indicated that "historically Chapter 22 has not resulted in equal treatment of demand-side and supply-side" investments and that the MEEIA was enacted, in part to correct that disparity in treatment. Therefore, the Commission's decision not to use the definition of lost revenue found within Chapter 22 was not arbitrary or unreasonable in light of the record. Accordingly, Ameren's first point and KCP & L's first point are denied.

Ameren and KCP & L further take issue with the fact that the rules provide that "[a]ny explicit utility lost revenue component of a DSIM shall be implemented on a retrospective basis and all energy and demand savings to determine a DSIM utility lost revenue requirement must be measured and verified through EM & V prior to recovery." 4 C.S.R. § 240–20.093(2)(G)5. The utilities assert that the retrospective nature of recovery contravenes the MEEIA's objective that the Commission should promulgate rules that

---

7. Rule 4 C.S.R. § 240–22.020(36) provides "[l]ost revenues means the reduction between rate cases in billed demand (kW) and energy (kWh) due to installed end-use measures, multiplied by the fixed-cost margin of the appropriate rate component."

"[p]rovide for timely cost recovery for utilities." § 393.1075.3(1).

However, the MEEIA provides that "[t]he [C]ommission shall provide oversight and may adopt rules and procedures and approve corporation-specific settlements and tariff provisions, *independent evaluation of demand-side programs*, as necessary, to ensure that electric corporations can achieve the goals of this section." § 393.1075.11 (emphasis added). The MEEIA, therefore, expressly states that the Commission can adopt rules that require independent evaluation of demand-side programs.

Furthermore, as previously discussed, § 393.1075.4 provides that the Commission cannot permit recovery unless the programs "result in energy or demand savings." As explained by the Commission, the rules permit only retrospective recovery of the lost revenues to ensure that utilities will recover lost revenue only when their demand-side programs result in energy or demand savings. Therefore, the retrospective application of the lost revenues component does not contravene the objectives of the MEEIA. Thus, Ameren's second point and KCP & L's second point are denied.[8]

 We now address the OPC's third point. The OPC asserts that the Commission erred in concluding that it lacked statutory authority to create provisions in the rules the violation of which could lead to the imposition of penalties because the Commission has such authority pursuant to § 386.250 and § 393.140, which empower the Commission with broad authority to regulate the operations of electrical corporations. The issue of penalties arose out of language appearing in prior versions of rule 4 C.S.R. § 240–20.094(2). 4 C.S.R. § 240–20.094(2) sets forth guidelines under which the Commission can review utilities' progress toward achieving the ultimate goal of all cost-effective demand-side savings. The rule provides annual energy and demand savings goals for utilities to achieve each year beginning in 2012. Prior to the hearing, rule 4 C.S.R. § 240–20.094(2) stated "[t]he fact that the electric utility's demand-side programs do not meet the incremental or cumulative annual demand-side savings goals established in [4 C.S.R. § 240–20.094(2)] may impact the utility's DSIM revenue requirement but is not by itself sufficient grounds to assess a penalty or adverse consequence for poor performance."

In its comments on the proposed rule, the Missouri Energy Development Association ("MEDA") opposed the quoted language and asserted it should be removed from the rule. In its order of rulemaking pertaining to rule 4 C.S.R. § 240–20.094, the Commission summarized MEDA's comments regarding the penalty language and its response to those comments as follows:

> The MEDA stakeholders believe that the sentence in 4 CSR 240–20.094(2) reading: "The fact that the electric utility's demand-side programs do not meet the incremental or cumulative annual demand-side savings goals established in this section may impact the utility's DSIM revenue requirement but is not by itself sufficient grounds to assess a penalty or adverse consequence for poor

---

8. Because we denied KCP & L's points I–III, we need not address its fourth point, which provides "[t]he Commission erred in issuing its orders of rulemaking in case No. EX–2010–0368 and the orders should be reversed and remanded pursuant to sections 386.510 and 386.540 because said orders are unlawful and unreasonable in that they violate the express provisions of section 536.014 due to the substantive errors set forth in points one through three herein."

performance" is offensive to the language in Section 393.1975.3[sic] that positively encourages demand-side investment. MEDA states there is no language in the statute authorizing the implementation of penalties or adverse consequences and this language should be deleted.

**RESPONSE AND EXPLANATION OF CHANGE:** The Commission agrees and this language shall be removed. Additionally, the commission will add the following language to this section: The goals established in this section are not mandatory and no penalty or adverse consequence will accrue to a utility that is unable to achieve the listed annual energy and demand savings goals.

On appeal, the OPC emphasizes the general powers of the Commission to supervise electrical corporations and adopt rules that prescribe conditions for rendering public service utilities. *See* § 393.140; § 386.250. The OPC states that we must interpret these general powers of the Commission broadly and, accordingly, must conclude that the Commission has the authority to penalize utilities who fail to meet the energy and demand savings goals set forth in rule 4 C.S.R. § 240–20.094(2)(A)–(B).

However, the order of rulemaking makes no mention of the general regulatory powers of the Commission, and our review of the record establishes that the discussion regarding penalties and adverse consequences for failing to comply with the annual energy and demand savings goals revolved solely around the language of the MEEIA. Indeed, the Commission's summarization of MEDA's comments and its response to them reflects the Commission considered whether to impose penalties and adverse consequences solely under the MEEIA. Therefore, we must look to the language of § 393.1075 to conclude whether the Commission erroneously chose to eliminate the reference to penalizing utilities that fail to achieve the energy savings goals outlined in rule 4 C.S.R. § 240–20.094(2).

Section 393.1075.11 specifically states that any adopted rules should "ensure that electric corporations can achieve the goals of this section." As previously discussed, the purpose of the MEEIA is to encourage utilities to invest in energy efficiency programs. Utilities are not obligated under the MEEIA to implement demand-side programs. Rather, the MEEIA was enacted to encourage utilities to voluntarily invest in such programs. Adopting rules that would impose the risk of penalties or adverse consequences as a result of such programs provides little incentive for utilities to implement such programs voluntarily. Thus, the Commission did not err in concluding that adopting a rule permitting the imposition of penalties or adverse consequences was inconsistent with the goal of the MEEIA to encourage demand-side investment. Point denied.

■ In its fourth point, the OPC avers that the Commission's order of rulemaking with respect to rule 4 C.S.R. § 240–20.094 is null and void and unenforceable because the order of rulemaking fails to comply with § 536.021.6(4) in that the Commission failed to respond to a portion of the OPC's comments regarding rule 4 C.S.R. § 240–20.094. Section 536.021.6(4) requires the Commission's final order of rulemaking to contain

[a] brief summary of the general nature and extent of comments submitted in support or in opposition to the proposed rule and a concise summary of the testimony presented at the hearing, if any, held in connection with said rulemaking, together with *a concise summary of the state agency's findings with respect to the merits of any such testimony or*

*comments which are opposed in whole or in part to the proposed rule.*

(Emphasis added). Section 536.021.7 further provides that "any rule, or amendment or rescission thereof, shall be null, void and unenforceable unless made in accordance with the provisions of this section." Thus, the OPC contends that rule 4 C.S.R. § 240–20.094 must be found to be unenforceable because the Commission failed to comply with § 536.021.6(4) by not directly addressing one of the OPC's comments about the rule in the order of rulemaking.

The OPC's contentions stem from Comment # 7 in the rulemaking order pertaining to rule 4 C.S.R. § 240–20.094. In the four single-spaced pages that Comment # 7 comprises, the Commission summarizes the general comments it received from nine participants regarding the annual energy and demand savings goals set forth at 4 C.S.R. § 240–20.094(2)(A)–(B). In doing so, the Commission summarizes, at length, the OPC's concerns regarding how rule 4 C.S.R. § 240–20.094(2)(A) should specify certain aspects about how a utility's annual savings goals will be calculated.

Following its summarization of the participants' comments, the Commission provides its response. At the conclusion of its response, the Commission states that it will not adopt any changes to the current language in 4 C.S.R. § 240–20.094(2)(A) and notes "that it is possible that the commission will amend this rule in the future" because it is required to evaluate the effectiveness of the energy and demand savings goals four years from the rule's effective date. Thus, Comment # 7 establishes that the Commission clearly acknowledged the OPC's concerns about the specific calculation of a utility's savings goals. Its response, however, infers the Commission did not believe such specifications needed to be addressed in the rule.

Furthermore, the purpose of the notice and comment procedures in § 536.021 is to "allow opportunity for comment by supporters or opponents of the measure, and so to induce a modification." *State ex rel. City of Springfield v. Pub. Serv. Comm'n,* 812 S.W.2d 827, 833 (Mo.App. W.D.1991), *overruled on other grounds by Missouri Mun. League v. State,* 932 S.W.2d 400, 402 (Mo. banc 1996). As previously mentioned, the Commission provided an extensive summary of the comments and its response regarding the participants' concerns about the annual savings goals set forth in 4 C.S.R. 240–20.094(2)(A)-(B). This was not a situation in which the Commission gravely ignored the comment process or prevented the OPC from somehow participating therein. Rather, the final order of rulemaking establishes that the Commission afforded supporters and opponents of the rule, including the OPC, the opportunity to express their concerns about the proposed rule and took their comments and concerns about the proposed rule under consideration. Therefore, the order of rulemaking is enforceable. Point denied.

For the foregoing reasons, the orders of rulemaking are affirmed.

All concur.