

# In the
# Missouri Court of Appeals
## Western District

IN THE MATTER OF THE
APPLICATION OF UNION ELECTRIC
COMPANY D/B/A AMEREN MISSOURI
FOR PERMISSION AND APPROVAL
AND A CERTIFICATE OF PUBLIC
CONVENIENCE AND NECESSITY
AUTHORIZING IT TO CONSTRUCT A
WIND GENERATION FACILITY;
OFFICE OF THE PUBLIC COUNSEL,

        **Appellant,**

v.

MISSOURI PUBLIC SERVICE
COMMISSION,

        **Respondent.**

**WD82492**

**OPINION FILED:**

**October 22, 2019**

---

### APPEAL FROM THE PUBLIC SERVICE COMMISSION

**Before Division Three:**
**Gary D. Witt, P.J., Edward R. Ardini, and Thomas N. Chapman, JJ.**

The Missouri Office of the Public Counsel (OPC) appeals the Report and Order of the

Missouri Public Service Commission (PSC) allowing Union Electric Company[1] (Ameren) to

recapture fifteen percent of its interim depreciation expenses associated with the building of the

---

[1] In Missouri, Union Electric Company does business as Ameren Missouri. We will refer to it as "Ameren" for this opinion.

High Prairie Wind Farm (Wind Farm) by an interim rate adjustment (a surcharge) **before** Ameren's next rate case -- as may be provided by the Renewable Energy Standard Cost Recovery Mechanism (RESRAM). [2]

OPC does not challenge approval of construction of the Wind Farm. OPC agrees that Ameren's election to utilize the Plant in Service Accounting (PISA) procedure permitted by §393.1400.2(1)[3] entitled (and, in fact, required) Ameren to defer a fixed eighty-five percent of the interim Wind Farm depreciation expenses and returns as a regulatory asset to be considered in calculating its rate base in Ameren's next rate case. The OPC does not contest that Ameren is entitled to pass on to its customers up to 100% of its other prudently incurred costs and benefits of the Wind Farm that are not subject to PISA deferral through an interim rate adjustment as provided by RESRAM.

In its appeal, OPC only challenges the PSC's decision to allow Ameren to recover by RESRAM's interim rate adjustment the fifteen percent of interim depreciation expenses related to the Wind Farm that is not accounted for in the PISA procedure. OPC maintains that, once elected, § 393.1400's PISA accounting procedure is the exclusive means for Ameren to recover the interim depreciation expenses and return associated with the Wind Farm construction. We affirm the PSC's Report and Order.

---

[2] "Interim" as used in this context refers to the period after the construction of the Wind Farm but prior to the next time Ameren appears before the Commission to have its rates established. As defined by Business Dictionary, depreciation expense is "The portion of a tangible capital asset that is deemed to have been consumed or expired, and has thus become an expense." Available at http://www.businessdictionary.com/definition/depreciation-expense.html (last accessed August 30, 2019).

[3] All statutory references are to RSMo 2018 as updated through the most current supplement.

**Statement of Facts**

Ameren is an electrical corporation as defined in § 386.010, subject to regulation by the PSC. Ameren applied for a Certificate of Convenience and Necessity to build the High Prairie Wind Farm in 2018. While the location, design and parameters of this facility were the subject of substantial comment and argument, the stakeholders ultimately entered into a stipulation and agreement (later approved in a formal order of the PSC) that left only the one issue (now on appeal) to be resolved by the PSC.[4] In order to put this issue into its proper context, a brief survey of Missouri's regulatory scheme for utilities is required.

*Missouri's Regulation of Utility Corporations*

Missouri established the PSC and requires a "just and reasonable" rate structure mandated under § 393.130.1, in recognition that utility providers, while often private companies, provide an essential public good and enjoy a quasi-monopoly on that good. Reasonable rates should balance utility investor and consumer interests, compensating the utility company for its operating and maintenance expenses, servicing its debt, and allowing a reasonable rate of return (profit) for its investors. *State ex rel. Office of Public Counsel v. Public Service Commission*, 367 S.W.3d 91, 108 (Mo. App. S.D. 2012); *Fed Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944). Utility rates are established periodically by proceedings before the PSC known colloquially within the industry as "rate cases." Rates are based on the amount of revenue necessary to build, maintain, and operate the utility plants and associated infrastructure (referred to as "rate base"), plus a reasonable rate of return for utility company investors. *Hope*

---

[4] While the Sierra Club, a party to the case, did not sign the stipulation, it authorized the signatories to indicate it did not oppose the stipulation and it entered no opposition after it was filed. Pursuant to CSR 240-2.115, if no such objection is made for seven days after such a filing, the Commission can, and did, treat the stipulation and agreement as unanimous.

*Natural Gas Co.*, 320 U.S. at 603. Unless otherwise provided for by law, an electrical corporation is not permitted to adjust the rate it charges customers until its next rate case. Even if an electrical corporation found it necessary to build a new power plant years before its next rate case, unless expressly permitted to by statute, it would not ordinarily be allowed to recoup its expense or earn profit on that capital investment in the interim. This phenomenon is referred to as "regulatory lag."

At issue in this appeal is the interplay of two means which may allow Ameren to incorporate interim Wind Farm expenses and return into its rate structure: (1) PISA, which, if elected, requires them to defer eighty-five percent of interim depreciation expenses and returns (on qualifying plants) into a regulatory asset that is later taken into account at Ameren's next general rate case; and (2) RESRAM, which permits an interim adjustment to the previously approved rate to reflect Ameren's prudently incurred costs, as well as any benefits.

*Missouri's Renewable Energy Standard*

In 2007, Missouri enacted § 393.1030[5] establishing Missouri's Renewable Energy Standard (RES) which required the PSC to "prescribe by rule a portfolio requirement for all electric utilities to generate or purchase electricity generated from renewable energy resources." § 393.1030.1. The statute established what share of an electric utility's sales must be comprised

---

[5] In relevant part, § 393.1030.1 states:

> The commission shall, in consultation with the department, prescribe by rule a portfolio requirement for all electric utilities to generate or purchase electricity generated from renewable energy resources. Such portfolio requirement shall provide that electricity from renewable energy resources shall constitute the following portions of each electric utility's sales:
>
> (1) No less than two percent for calendar years 2011 through 2013;
> (2) No less than five percent for calendar years 2014 through 2017;
> (3) No less than ten percent for calendar years 2018 through 2020; and
> (4) No less than fifteen percent in each calendar year beginning in 2021.

4

of renewable energy (requiring increased minimum percentages over time) and also set penalties for failure to meet those requirements. §§ 393.1030.1(1)-(4), 2(2). Subsection 393.1030.2(4) directed the PSC to create a "[p]rovision for recovery outside the context of a regular rate case of prudently incurred costs and the pass-through of benefits to customers of any savings achieved by an electrical corporation in meeting the requirements of this section." In response to this dictate, the PSC promulgated Commission Rule 4 CSR 240-20.100, which provides for the establishment of a Renewable Energy Standard Rate Adjustment Mechanism (RESRAM), which is defined by 4 CSR 240-20.100(1)(P) as "a mechanism that allows periodic rate adjustments to recover prudently incurred RES compliance costs and pass-through to customers the benefits of any savings achieved in meeting the requirements of the Renewable Energy Standard."

RESRAM not only serves as a mechanism to impose rate adjustments (prior to the next rate case) for up to 100% of the prudently incurred interim costs (depreciation) associated with capital investments in renewable source plants; but may also allow interim surcharges for other prudently incurred costs associated with renewable energy compliance.[6] While requiring an electrical corporation to go through the process of requesting an interim rate adjustment and establishing that all costs were prudently incurred, the RESRAM mechanism permits utility companies to lessen the impact of regulatory lag by permitting interim rate increases (surcharges) outside the context of (and in advance of) the next regular rate case.

---

[6] In its Appellant's Brief, OPC indicates (and Respondents do not dispute) that some of the other renewable source compliance costs (that may be accounted for via interim RESRAM surcharges to customers) include any premium on the cost to purchase renewable source electricity generated by other utility companies (for resale to customers); any additional costs to enable transmission from a renewable energy source to the grid, and the costs incurred in selecting a site for a renewable plant.

*The Plant in Service Accounting Statute*

In 2018, the Missouri legislature adopted § 393.1400. This statute permitted electrical corporations to elect to defer eighty-five percent of interim depreciation expenses and returns for qualifying electric plants[7] ("plant-in-service") to a regulatory asset that (in addition to the balance of that asset) would be included as part of its rate base in the next general rate case. § 393.1400.2(1). If an electrical corporation elects to employ the "plant-in-service" accounting (PISA) permitted by § 393.1400 to make these deferrals, it is required to defer a set amount of depreciation expense in the following manner:

> Notwithstanding any other provision of this chapter to the contrary, electrical corporations shall defer to a regulatory asset eighty-five percent of all depreciation expense and return associated with all qualifying electric plant recorded to plant-in-service on the utility's books commencing on or after August 28, 2018, if the electrical corporation has made the election provided for by subsection 5 of this section by that date, or on the date such election is made if the election is made after August 28, 2018. In each general rate proceeding concluded after August 28, 2018, the balance of the regulatory asset as of the rate base cutoff date shall be included in the electrical corporation's rate base without any offset, reduction, or adjustment based upon consideration of any other factor, other than as provided for in subdivision (2) of this subsection, with the regulatory asset balance arising from deferrals associated with qualifying electric plant placed in service after the rate base cutoff date to be included in rate base in the next general rate proceeding.

*Id*.

Once elected, "plant-in-service" accounting (PISA) requires an electrical corporation to defer eighty-five percent of the interim depreciation expense and return on investment ("return") associated with a new qualifying electric plant until its next rate case. Those deferred costs and

---

[7] Section 393.1400.1 (3) defines "qualifying electric plant" that is eligible for "plant-in-service accounting" (PISA) as follows:

> "Qualifying electric plant", all rate base additions, except rate base additions for new coal-fired generating units, new nuclear generating units, new natural gas units, or rate base additions that increase revenues by allowing service to new customer premises[.]

returns are included as a regulatory asset in calculating the electric company's rate base when setting rates in the subsequent rate case. This enables the electrical corporation to account for eighty-five percent of the regulatory lag on qualified interim infrastructure investment, without requiring a request for a rate adjustment (surcharge) outside the context of (and in advance of) the next regular rate case.

*Interplay of RES and PISA with High Prairie Wind Farm*

Because the High Prairie Wind Farm was part of Ameren's effort to comply with Missouri's Renewable Energy Standards (RES), as part of its initial request for a Certificate of Convenience and Necessity (CCN), Ameren included a proposed RESRAM to pass on the costs as permitted by the RES statute and PSC rule. However, while the CCN for the High Prairie Wind Farm was under consideration by the PSC, the PISA statute was enacted by the Missouri legislature. After enactment of the PISA statute, Ameren filed a notice with the PSC stating that it intended to have its interim depreciation expense and expected return be deferred by the PISA accounting procedure, which would then have eighty-five percent of those costs accounted for in the next rate case. Ameren amended its requested RESRAM, so that the portion of the prudently incurred costs it sought to recover via RESRAM, which was related to depreciation expense and return, was limited to the balance (fifteen percent) not deferred via PISA. The OPC objected, maintaining that the two statutory schemes were mutually exclusive and that, once Ameren opted to proceed under the PISA statute, it could not seek to recover interim depreciation costs through any other mechanism. The OPC proffered an alternative RESRAM that did not include any depreciation expenses or return. As described in the order "[t]he one remaining unresolved issue concerns the requested RESRAM."

An evidentiary hearing to address this one remaining issue was conducted on October 31, 2018. In its Report and Order entered on December 12, 2018, the PSC determined that there was no conflict between the RES statute and the PISA statute and granted Ameren's proposed RESRAM, which allowed Ameren to include the balance (fifteen percent) of its interim depreciation expense on the Wind Farm when calculating its interim rate adjustment (a surcharge to its customers). This appeal followed.

## Standard of Review

Judicial review of a PSC order is two-fold. *In Matter of Kansas City Power & Light Co.'s Request for Auth. To Implement a Gen. Rate Increase for Elec. Serv. V. Missouri Pub. Serv. Comm'n,* 509 S.W.3d 757, 763–64 (Mo. App. W.D. 2016).

> First, we must determine whether the PSC's order was lawful. "An order's lawfulness depends on whether the [PSC's] order and decision was statutorily authorized. When determining whether the order is lawful, we exercise independent judgment and must correct erroneous interpretations of the law. Because the [PSC] is purely a creature of statute, its powers are limited to those conferred by statute either expressly, or by clear implication as necessary to carry out the powers specifically granted.
>
> Second, we must determine whether the [PSC's] order was reasonable. In determining whether the Commission's order is reasonable, we consider (1) whether it was support[ed] by substantial and competent evidence on the whole record, (2) whether the decision was arbitrary, capricious, or unreasonable, and (3) whether the [PSC] abused its discretion."

*Id.* (quoting *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n,* 397 S.W.3d 441, 446 (Mo. App. W.D. 2013)) (internal citations omitted).

## Analysis

The question before us is whether Ameren could elect to defer eighty-five percent of the interim depreciation expenses of the High Prairie Wind Farm as provided for by the PISA statute, while also including the remaining fifteen percent of depreciation expenses to be recovered in its

8

RESRAM. The OPC contends that the PISA statute requires Ameren to use either PISA or a RESRAM to account for the interim depreciation costs, but that it cannot do both. OPC and Ameren contend that the RESRAM statute and regulation allow Ameren to include up to one hundred percent of the interim depreciation expense in calculating its interim rate adjustment, and that nothing in the PISA statute explicitly, or by implication, denies Ameren (regardless of its PISA election) the opportunity to claim fifteen percent of the interim Wind Farm depreciation expense in its RESRAM.[8]

Our "primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *State v. Johnson*, 524 S.W.3d 505, 510 (Mo. banc 2017) (quoting *Parktown Imps., Inc. v. Audi of Am., Inc.*, 278 S.W.3d 670, 672 (Mo. banc 2009)). "In order to discern the intent of the General Assembly, the Court looks to statutory definitions or, if none are provided, the text's 'plain and ordinary meaning,' which may be derived from a dictionary." *Gash v. Lafayette Cty.*, 245 S.W.3d 229, 232 (Mo. banc 2008*)*; *see also* § 1.090 ("Words and phrases shall be taken in their plain or ordinary and usual sense, but technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import.").

"When the words [of a statute] are clear, there is nothing to construe beyond applying the plain meaning of the law." *Johnson*, 524 S.W.3d at 511 (quoting *Bateman v. Rinehart*, 391 S.W.3d 441, 446 (Mo. banc 2013)). "We construe statutes only where they are ambiguous."

---

[8] The RESRAM approved by the PSC only allows fifteen percent of Ameren's interim depreciation expenses to be considered in its rate adjustments prior to the next rate case. Eighty-five percent of those interim depreciation expenses would be deferred by the PISA accounting procedure, and accounted for in the next rate case. So long as proper accounting procedures are followed, there should be no duplicate accounting ("double dipping") of said depreciation expenses when setting rates for Ameren's customers.

*State ex rel. Missouri Highway & Transp. Comm'n v. Alexian Bros. of St. Louis*, 848 S.W.2d 472, 474 (Mo. banc 1993); *see also State ex rel. Lavender Farms, LLC v. Ashcroft*, 558 S.W.3d 88, 91 (Mo. App. W.D. 2018).

"Where two statutory provisions covering the same subject matter are unambiguous standing separately but are in conflict when examined together, a reviewing court must attempt to harmonize them and give them both effect." *S. Metro. Fire Prot. Dist. v. City of Lee's Summit*, 278 S.W.3d 659, 666 (Mo. banc 2009).

In the instant case, the OPC argues that the following section of the PISA statute makes it the exclusive mechanism under which an electric corporation can recover depreciation expenses associated with a new electrical facility:

> Notwithstanding any other provision of this chapter to the contrary, electrical corporations shall defer to a regulatory asset eighty-five percent of all depreciation expense and return associated with all qualifying electric plant [sic] recorded to plant-in-service on the utility's books … In each general rate proceeding concluded after August 28, 2018, the balance of the regulatory asset as of the rate base cutoff date shall be included in the electrical corporation's rate base without any offset, reduction, or adjustment based upon consideration of any other factor…. with the regulatory asset balance arising from deferrals associated with qualifying electric plant placed in service after the rate base cutoff date to be included in rate base in the next general rate proceeding.

§ 393.1400.2(1).

Since the parties agree that Ameren is an electrical corporation as defined by the PISA statute and that the High Prairie Wind Farm is a qualifying electric plant, we need not engage in analysis of those terms. All parties also agree that a plain reading of the remaining portion of the PISA statute indicates that, once Ameren elected the PISA accounting procedure, it was required to "defer to a regulatory asset eighty-five percent of all depreciation expense and return

associated with" the High Prairie Wind Farm for inclusion in its rate base in its next rate case.[9]

*Id*. The statute then dictates that when Ameren has its next rate case, the balance of the qualified regulatory asset (in this instance the remaining portion of the Wind Farm regulatory asset not previously subject to depreciation) as of the "rate base cutoff date"[10] will also be included in Ameren's rate base "without any offset, reduction, or adjustment."

The parties agree that enabling Ameren to elect PISA allows it to include eighty-five percent of interim depreciation expenses in its rate base at its next rate case and to then pass on that portion of its interim depreciation costs to its customers. All experts who provided testimony indicated that, because the PISA regulatory asset permits Ameren to eventually add a portion of interim deprecation costs to rate base, the PISA mechanism limits its exposure to regulatory lag. However, the parties disagree whether the legislature intended that, once elected, PISA would be the exclusive means to eventually pass on interim depreciation costs to its customers (OPC's position); or whether RESRAM could also be used to adjust rates (in the interim) to account for the fifteen percent of depreciation costs not deferred through PISA.

We first note that there is nothing in the PISA statute that explicitly indicates an intention to curtail or limit the RESRAM mechanism. Nor is there anything in the PISA statute that indicates it is the only means to adjust rates for depreciation on PISA-qualified assets. Nothing in the PISA statute indicates that eighty-five percent is the cap on accounting for interim

---

[9] While "regulatory asset" is not a defined term within the statute this Court has defined one as an "accounting deferral mechanism that re-characterizes an income statement item ('revenues, expenses, gains, or losses') in a current period as a balance sheet item ('regulatory assets' or 'regulatory liabilities') that would be addressed in a future rate proceeding." *In Matter of Kansas City Power & Light Co.'s Request for Auth. to Implement a Gen. Rate Increase for Elec. Serv. v. Missouri Pub. Serv. Comm'n,* 509 S.W.3d 757, 769 n.3 (Mo. App. W.D. 2016).

[10] "Rate base cutoff date" is statutorily defined as "the date rate base additions are accounted for in a general rate proceeding." § 393.1400.1(4).

11

depreciation on qualified assets in electric utility rate structures. OPC concedes that nothing in the statute directly addresses the fifteen percent of interim depreciation not deferred via the PISA election.[11]

OPC nevertheless takes the position that allowing a rate adjustment for eighty-five percent by one means (PISA) necessarily disallows the remainder being worked into the rate structure by another means (RESRAM). In support of its argument, the OPC notes that the PISA statute requires those electing to proceed under the statute to "defer to a regulatory asset eighty-five percent of **all** depreciation expense and return associated" with a qualifying electric plant. *Id*. (emphasis added). The OPC asserts that by setting the amount of interim depreciation expense that must be deferred into the regulatory asset at eighty-five percent of **all** depreciation expenses, the PISA statute plainly meant to foreclose recovery of the remaining fifteen percent by any other means. We find the argument entirely unavailing. Even if the rate adjustment mechanisms (PISA and RESRAM) addressed identical operating expenses and returns (which they do not), in the absence of any other language to the contrary, nothing suggests that the other fifteen percent of the "all" (not provided for by PISA deferral) cannot be accounted for in the rate structure by some other means (RESRAM).[12] In short, requiring that eighty-five percent of

_____

[11] In its Brief, OPC indicates "Section 393.1400 does not otherwise reference the fifteen percent remainder, nor does any other provision of PISA's enacting legislation."

[12] OPC also asserts that the legislature signaled its intent to have PISA be the exclusive means to account for qualifying plant regulatory lag, when it provided as follows in § 393.1400.2(1):

> (1)…[T]he balance of the regulatory asset as of the rate base cutoff date shall be included in the electrical corporation's rate base without any offset, reduction, or adjustment based upon consideration of any other factor, other than as provided for in subdivision (2) of this subsection, with the regulatory asset balance arising from deferrals associated with qualifying electric plant placed in service after the rate base cutoff date to be included in rate base in the next general rate proceeding.

Subdivision 2 of the same subsection provides as follows:

"all" depreciation be eventually incorporated in the rate structure in the next rate case (when

PISA is elected), does not foreclose the more immediate means to incorporate the other fifteen

percent in the rate structure in the meantime (between rate cases) by RESRAM surcharges.[13]

---

(2) The regulatory asset balances arising under this section shall be adjusted to reflect any prudence disallowances ordered by the commission. The provisions of this section shall not be construed to affect existing law respecting the burdens of production and persuasion in general rate proceedings for rate base additions.

The plain language of subdivision (1) of this subsection of the PISA statute limits offsets and reductions that can be applied to the "balance of the regulatory asset" that remains on the rate base cutoff date. This provision of subdivision (1) protects the balance of the regulatory asset from reductions or adjustments (other than those that may be disallowed as being imprudent at the next rate case as provided under subdivision (2)). It does not address, at all, the fifteen percent that is not addressed in the PISA statute. The exception to the exception under subdivision 2 (which permits reduction from the balance of the regulatory asset for disallowed imprudent costs) suggests that the language in subdivision (1) cited by the OPC does **not** address the other fifteen percent (of the interim depreciation) not addressed in the PISA statute. It makes no sense to potentially disallow for imprudence (by exception to the exception set out in subdivision (2)) the fifteen percent the OPC suggests is already disallowed by implication in subdivision (1). The plain meaning of the subdivisions, when read together, is that the eighty-five percent is being protected from offsets, adjustments, or reductions, except for disallowances (at the next rate case) for imprudent expenditures. This makes sense regarding the 85% deferral allowed by PISA, as it has not undergone (prior to the rate case) any scrutiny regarding the prudence of the capital expenditure before being incorporated into the rate structure; whereas RESRAM requires interim approval for prudently incurred costs before the surcharge may be imposed.

[13] The OPC also maintains that, because the legislature could have inserted language (in the PISA statute) explicitly permitting the recovery of the fifteen percent in a RESRAM, but did not do so, the legislature's silence signals an intent to disallow this recovery. In essence, OPC argues that RESRAM's rate adjustment is amended (or partially repealed) by implication, by PISA's mandate that (when elected) eighty-five percent of depreciation expense must be deferred to a regulatory asset. However, neither repeal, nor amendment, by implication is favored. *Turner v. School District of Clayton,* 318 S.W.3d 660, 667 (Mo. banc 2010); *LeSage Dirt Cheap Cigarettes and Beer, Inc.*, 102 S.W.3d 1, 5 (Mo. banc 2003). "If, by any fair interpretation both statutes may stand, there is no repeal by implication, and both statutes must be given their effect." *Turner*, 318 S.W.3d at 667 (quoting *Silcox v. Silcox*, 6 S.W.3d 899, 903 (Mo. banc 1999)). As we have stated, the PISA and RESRAM statutes are clear and may stand together without any explicit, or implicit, conflict. The statute enabling the RESRAM interim rate adjustment was not repealed or amended by implication (as suggested by OPC) by the enactment of the statute allowing electric companies to elect PISA accounting.

The OPC also argues that because subdivision 393.1400.2(1) begins with "Notwithstanding any other of this chapter," this suggests that the PISA statute conflicts with RESRAM, and thus charges us to harmonize their meaning. OPC simply has it backward. The "notwithstanding clause" provides that, *if* any statutes conflict with PISA, the provisions of PISA prevail. The "notwithstanding" provision doesn't imply or recognize a conflict, it simply indicates that, if any exist, the PISA provisions prevail. We find no such conflict, and thus no need to harmonize their provisions. But to the extent any conflict or ambiguity, may, by implication or otherwise be purported to exist, the statutes can be harmonized in the manner which was recognized by the PSC in its Report and Order and recognized in this opinion – that the PISA election's requirement of deferral of 85% of the interim depreciation expense of the Wind Farm as a regulatory asset in the next rate case does not conflict with, and in fact, complements RESRAM's mechanism to allow approval of surcharges for the other fifteen percent in the interim.

The plain and ordinary meaning of the RES statute and RESRAM regulation allow up to one-hundred percent (which would include the fifteen percent allowed Ameren) of the interim Wind Farm depreciation expense to be accounted for by interim surcharges to Ameren's customers (between rate cases). The plain and ordinary meaning of the PISA statute requires that, once elected, eighty-five percent of such interim depreciation expense be deferred to a regulatory asset accounted for in the next rate case. Since the words of the statutes are clear, unambiguous, and do not conflict, we need not engage in any further statutory construction. *Johnson*, 524 S.W.3d at 511. The Report and Order of the PSC was statutorily authorized. *K.C.P. & L. v. Missouri Pub. Serv. Comm'n,* 509 S.W.3d at 763–64. The PSC did not act arbitrarily, or abuse its discretion, in entering its Report and Order. *Id.*

The OPC's sole point on appeal is denied.

## Conclusion

The Report and Order of the PSC is affirmed.

/s/ *Thomas N. Chapman*

Thomas N. Chapman, Judge

All concur.

14